Jonathan Shub SBN# 237708
Benjamin F. Johns (*pro hac vice* forthcoming)
Samantha E. Holbrook (*pro hac vice* forthcoming)
**SHUB LAW FIRM LLC**
134 Kings Highway E
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLIS WILSON, individually and on behalf of all others similarly situated, | Case No.: 3:23-1293 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GOODRX HOLDINGS, INC., CRITEO CORP., META PLATFORMS, INC., AND GOOGLE LLC. | |
| Defendants. | |

Plaintiff Hollis Wilson ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Defendants GoodRx Holdings, Inc. ("GoodRx"), Criteo Corp. ("Criteo"), Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Meta"), and Google, LLC ("Google") (Criteo, Meta and Google are collectively referred to as the "Advertising and Analytics Defendants") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1. GoodRx is a combination telehealth and prescription coupon company. Founded in

2011, GoodRx claims that its mission is to "build better ways for people to find the right care at the best price." In 2021, GoodRx brought in more than $745 million in revenue.

2.     GoodRx's services are available through both the GoodRx website (www.goodrx.com) and the GoodRx mobile application (the "GoodRx Platform"). The GoodRx mobile application is advertised as the "#1 most downloaded medical app on the iTunes [Apple] and Google Play app stores." Approximately 20 million people use GoodRx's services each month.

3.     Users can sign up for an account with GoodRx by providing their first and last name, email address, and date of birth. They can also obtain a "GoodRx Prescription Savings Card" to obtain "discounts of up to 80% on most prescription drugs at over 70,000 U.S. pharmacies." To receive this card users are required to provide their first and last name, address, and email.

4.     GoodRx allows consumers to save money on prescription drugs by gathering current prices and discounts, as well as by offering prescription coupons. To access prescription discounts, a user enters the medication name and then selects a local pharmacy. They can also text, email, or print a copy of a "GoodRx Coupon" to present at the pharmacy when picking up their prescription. When the prescription is purchased using a GoodRx Coupon, GoodRx obtains a record of this purchase that includes the user's name, date of birth, and prescription information.

5.     GoodRx also offers telehealth services under the brand "HeyDoctor" and GoodRx Care." To access these services a user is prompted to provide their personally identifiable information ("PII"), including their first and last name, email address, phone number, biological sex, and current address. The user must then select the type of treatment they are seeking, such as urinary tract infection, erectile dysfunction, anxiety, depression, acne treatment, birth control, or short-term medication refills. Depending on the treatment or the prescription sought, a user is required to either complete an online consultation and enter information about their symptoms and medication history or schedule a visit with a provider. They must also provide payment information.

6.     Additionally, GoodRx offers "GoodRx Gold" which is a monthly "healthcare membership." Using this membership, GoodRx claims users can access over 1,000 prescriptions at

2

less than $10 and arrange visits with "licensed healthcare provider[s]" at just $19. GoodRx Gold users can also use this service to track their medication purchase history, including the medication name, purchase date, dosage, pharmacy, and prescriber.

7.      GoodRx operates under the brand "GoodRx Health," which allows users to access a number of informational resources about health conditions and treatments. For instance, users can select "How to Get Rid of a Urinary Tract Infection (UTI) Fast" written by Alice Perlowski, MD, MA, FACC.

8.      GoodRx claims that it values users' privacy and that it does not disclose or share the information it collects, including health information entered through the GoodRx Platform.

9.      For instance, on December 14, 2019, GoodRx's co-CEO Doug Hirsch tweeted "People can use GoodRx without giving us any information. Any information we do receive is stored under the ***same guidelines as any health entity***."

10.     Health entities are regulated under the Health Insurance Portability and Accountability Act ("HIPPA"), which restricts the use of personal health information and electronic personal health information. Among other things, it requires the user's authorized consent in writing before an entity can share this information with third parties. GoodRx's HeyDoctor homepage displayed a HIPPA seal, purportedly repeating these sentiments that it complied with HIPPA.

11.     Hirsch further explained in another tweet that same day "I think it's important to mention that we started GoodRx to help Americans, ***not gather data or exploit anyone***" and in another that GoodRx "spend[s] tons of time, energy and resources to protect the limited data we do have. You're right to be focused on this . . . and so are we."

12.     GoodRx's own policies repeat the same promises about safeguarding users' data. Between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

13.     Between October 2017 and December 2019, GoodRx promised that it would only

use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx coupons.

14.     During that time period, it also promised that when this information was shared in this limited capacity, it "ensures that these third parties are bound to comply with federal standards as to how to treat 'medical data' that is linked with your name, contact information and other personal identifiers."

15.     Beginning in March of 2019, GoodRx promised that it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

16.     Given the nature of this information shared through the GoodRx Platform and GoodRx's representations, Plaintiff and Class members believed their personal information, including health information relating to their medical conditions, symptoms, and prescriptions, would not be shared or disclosed.

17.     Unbeknownst to Plaintiff and Class members, this sensitive personal information communicated through the GoodRx Platform, including health information relating to medical treatments and prescriptions, was disclosed to and intercepted by some of the largest advertising and social media companies in the country, including the Advertising and Analytics Defendants, upon information and belief, with GoodRx's knowledge and consent.

18.     Through the Advertising and Analytics Defendants' tracking technology incorporated on the GoodRx Platform, including software development kits ("SDK") and tracking pixels, Defendants Google, Meta, and Criteo knowingly and intentionally intercepted Plaintiff and Class members' personal information, including health information relating to their medical conditions, symptoms, and prescriptions, communicated through the GoodRx Platform.

19.     This information was not aggregated or deidentified nor were the Advertising and Analytics Defendants prohibited from using this information for their own benefit. Defendants

Google, Meta, and Criteo used this information for their own purposes, including to allow GoodRx to advertise on their platforms using GoodRx users' health data.

20.    Plaintiff Hollis Wilson provided her personal information, including health data relating to her medical condition and medication history to GoodRx with the expectation that this information would remain confidential and private.

21.    Defendants' interception of this information without consent constitutes an extreme invasion of Plaintiff's and Class members' privacy. Given the secret and undisclosed nature of Defendants' conduct, additional evidence supporting Plaintiff's claims, including the full extent of medical information Defendants intercepted, and how they used that information, will be revealed in discovery.

## **PARTIES**

**A.    Plaintiff**

22.    Plaintiff Hollis Wilson is a resident of Burlingame, California.

23.    Plaintiff used the GoodRx platform on multiple occasions between 2015 and 2019 to obtain medical prescriptions.

24.    During the time Plaintiff used the GoodRx Platform, she maintained social media accounts with Facebook and Instagram, and multiple accounts with Google, including Gmail, Google Maps, and YouTube. Plaintiff used the same device to access the GoodRx Platform that she used to access her accounts with Facebook, Instagram, Google Maps, and YouTube.

25.    To obtain treatment and prescriptions through GoodRx, Plaintiff was required to enter her name, email address, phone number, biological sex, address, and payment information. She was also required to complete an online consultation, in which she communicated to GoodRx information about her symptoms and medication history. She paid for these services and received a prescription for an antibiotic through GoodRx.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

26.     Unbeknownst to Plaintiff, Defendant GoodRx disclosed and the Advertising and Analytics Defendants intercepted this information, including her PII, health data, prescription requests, and other activity across the GoodRx Platform.

27.     Plaintiff Hollis Wilson did not consent to the sharing and interception of her data, or the use of this information by Defendants.

**B.      Defendants**

<u>Defendant GoodRx Holdings, Inc.</u>

28.     Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal place of business located in Santa Monica, California.

29.     GoodRx knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the GoodRx Platform without disclosure to its users, including at least SDKs and tracking pixels provided by the Advertising and Analytics Defendants. The Advertising and Analytics Defendants developed each of these tracking technologies for the express purpose of collecting data from users for, among other things, marketing, analytics, and advertising purposes. GoodRx knew at the time it incorporated these software into the GoodRx Platform that it would result in the disclosure and interception of users' interactions on the GoodRx Platform, including PII, health information, prescription requests, and other identifiable information, by virtue of how these technologies function and the analytics and insights they received as a result. For example, Meta allows website and app developers, like GoodRx, to use the Meta Pixel and its SDK with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Facebook ads. GoodRx served targeted advertisements to users using the sensitive data disclosed to and intercepted by the Advertising and Analytics Defendants between at least August 2017 and February 2020. Accordingly, it was well aware of the data it disclosed and allowed the Advertising and Analytics Defendants to intercept. Despite this, GoodRx continued to incorporate the Advertising and Analytics Defendants' technologies into the GoodRx Platform and reap their

6

1    benefit, including by increasing its overall revenue through advertisements and by improving the

2    GoodRx Platform. As such, GoodRx's conduct was intentional despite knowing the privacy

3    violations it caused to Plaintiff and Class members.

4          Defendant Meta Platforms, Inc.

5          30.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of

6    business located in Menlo Park, California.

7          31.    Meta at all times knew that the incorporation of its software into the GoodRx

8    Platform would result in its interception of identifiable health information and other sensitive data.

9    Meta, as the creator of its SDK and Meta Pixel, knew that it intercepted each of a user's interactions

10   on the website or mobile application that incorporated this technology. Meta has consistently come

11   under scrutiny for incorporating its technology on websites and applications that involve the

12   transmittal of sensitive data, including health information, as reported on by the *Wall Street Journal*

13   in February 2019, and subsequently investigated by the Federal Trade Commission and the New

14   York State Department of Financial Services. Further, since at least 2016, Meta has allowed granular

15   ad targeting based on sensitive information collected or received about individuals, including

16   relating to at least breast feeding, ethnicities, religious beliefs, and income levels.

17         32.    Despite this, it was not until November 9, 2021 that Meta acknowledged its use of

18   data to target users based on "sensitive" topics, including "health" and how that was problematic.

19   While Meta stated that it would remove this functionality in part, it later clarified that the change

20   was limited to individuals' interactions with "content" on the Facebook platform (i.e., the "Detailed

21   Targeting" option on Facebook) and ***did not apply to*** data intercepted through Meta Pixel or SDK

22   or collected through other means. Thus, third parties were still permitted to use "website custom

23   audiences" and "lookalike" audiences to target users based on the information Meta intercepted

24   through Meta Pixel and its SDK. Further, Meta has acknowledged its interception of sensitive data,

25   including health information, in public statements highlighting its efforts to develop a "Health

26

27                                          7

28

Terms Integrity System" intended to filter out this type of information and prevent it from entering Meta's system.

33.     However, independent investigations have confirmed these data filtration systems are not successful at preventing the interception of health data. For instance, researchers at *The Markup* found while investigating the use of Meta Pixel on abortion-related websites that Meta's purported "filtering" system failed to discard even the most obvious forms of sexual health information, including URLs that included the phrases "post-abortion", "i-think-im-pregnant" and "abortion-pill."

34.     Meta's own employees have confirmed the same, admitting that Meta lacks the ability to prevent the collection of sensitive health data or its use in ads. For example, Meta engineers on the ad and business product team wrote in a 2021 privacy overview "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'" As demonstrated by the continued incorporation of Meta's tracking technology on the GoodRx Platform, Meta did not take any steps to prevent its interception and use of GoodRx users' sensitive health data. Meta's conduct was intentional despite knowing the privacy violations it caused to Plaintiff and Class members.

Defendant Google LLC

35.     Defendant Google LLC is a Delaware limited liability company with its principal place of business located in Mountain View, California. Google, as the creator of its SDK and Pixel, and as an established advertising company, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology. Accordingly, Google at all times knew that the incorporation of its software into the GoodRx Platform would result in its interception of sensitive information, including health information relating to medical treatment and prescriptions.

36.     Indeed, this is not the first or last time Google has been called out for collecting sensitive data like health information. Indeed, in a February 2019 article from the *Wall Street Journal* discussing the collection and receipt of sensitive health data from users of a popular women's menstruation app by Meta through its SDK, Google was contacted for comment. Google's own SDK and tracking technology also collected the same data from this popular women's menstruation app, which was later revealed following an investigation by the Federal Trade Commission.   Google's tracking technology is embedded on the GoodRx Platform, from which it received health information like medical treatment and prescription information. Google did not take any steps to prevent its interception and use of GoodRx users' sensitive health data. As such, Google's conduct was intentional despite knowing the privacy violations it caused to Plaintiff and Class members.

Defendant Criteo Corp.

37.     Defendant Criteo Corp. is a Delaware corporation with its principal place of business located in New York, New York. Criteo, as the creator of its SDK and Pixel, knew that it intercepted each of a user's interactions on the website or mobile application that incorporated this technology. Accordingly, Criteo at all times knew that the incorporation of its software into the GoodRx Platform would result in its interception of sensitive information, including health information relating to medical treatment and prescriptions. As demonstrated by the continued incorporation of Criteo's tracking technology on the GoodRx Platform, Criteo did not take any steps to prevent its interception and use of GoodRx users' sensitive health data. As such, Criteo's conduct was intentional despite knowing the privacy violations it caused to Plaintiff and Class members.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from the Defendants.

39.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiff is a resident of California, whereas Defendants are Delaware entities with their principal places of business in California or New York.

40.     This Court has personal jurisdiction over Google and Meta because their principal places of business are in California. Google, Meta, and Criteo are also subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State, including Defendants' collection and interception of Plaintiff's sensitive health data from the GoodRx Platform and use of that data for commercial purposes.

41.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Defendants GoodRx, Google, and Meta are headquartered in this District and subject to personal jurisdiction in this District.

42.     **Divisional Assignment**: This action arises in San Mateo County, in that a substantial part of the events which give rise to the claims asserted herein occurred in San Mateo County. Pursuant to L.R. 3-2(e), all civil actions that arise in San Mateo County shall be assigned to the San Francisco or Oakland Division.

## FACTUAL BACKGROUND

**A.     The GoodRx Business Model**

43.     GoodRx was founded in 2011 as a prescription coupon company. It has since expanded to provide a number of services, including telehealth and informational material about health conditions and medications.

44.     To create an account with GoodRx, users must provide their first and last name, email address, and date of birth. Users can also obtain a "GoodRx Prescription Savings Card." To receive this card users are required to provide their first and last name, address, and email. They can then

use this card for discounts on prescriptions at more than 70,000 pharmacies. An image of the Prescription Savings Card is depicted below.

**Get your FREE GoodRx Prescription Savings Card!**

GoodRx
Prescription Savings Card

MEMBER ID
A C 6 3 5 0 1 2 5

BIN:      015995
PCN:      GDC
GROUP:    DR77

Show this card to save up to 80% on your prescriptions

Questions?
Customers: 1-855-442-9965
Pharmacists: 1-855-482-1940

45.     To search for prescription discounts, a user enters the medication name and selects a local pharmacy, as depicted in the image below. They can then text, email, or print a copy of a GoodRx Coupon to use when picking up the prescription. When a user does so, GoodRx obtains a record of this purchase that includes the user's name, date of birth, and prescription information.



**Stop paying too much for prescriptions**

Compare prices and save up to 80%

🔍 Enter a medication          **Find the lowest prices**

46.     GoodRx also offers telehealth services through the brand names "HeyDoctor" and GoodRx Care." These services require a user to enter PII, including their first and last name, email address, phone number, biological sex, and current address. The user is then prompted to select the type of treatment they are seeking, such as urinary tract infection, erectile dysfunction, anxiety,

11

depression, acne treatment, birth control, and short-term medication refills. Below is an example of what a user sees on the GoodRx platform.

**UTI (Urinary Tract Infection)**

Same-day prescription to treat your UTI. Expert advice on preventing future UTIs.

Start Now

**Erectile Dysfunction**

Same-day prescription for ED medication. Discreetly delivered or pharmacy pickup.

Start Now

**Birth Control**

Same-day birth control prescriptions. Start or refill any pill, ring, or patch.

Start Now

**Anxiety, Stress, and Depression Medicine Refill**

Refill your anxiety, stress, and depression medication today. No insurance needed.

Start Now

**Acne Treatment and Prevention**

Acne is a common skin condition that causes blemishes. We provide prescription strength creams and medicines to cure and prevent it.

Start Now

**Short-Term Medicine Refill**

Get a short-term (30 or 90 day supply depending on the medicine) refill of the medicines you take regularly.

Start Now

47.     Once a treatment is selected, the user is then required to either complete an online consultation and enter information about their symptoms and medication history or schedule a visit with a provider. They must also provide payment information.

48.     GoodRx also offers a paid service called "GoodRx Gold" that is paid on a monthly basis and combines its telehealth and prescription coupon services. Using this membership, GoodRx claims that users can access over 1,000 prescriptions at less than $10 and arrange visits with "licensed healthcare provider[s]" at just $19. GoodRx Gold users can also use this service to track their medication purchase history, including the medication name, purchase date, dosage, pharmacy, and prescriber.

12

**B.      GoodRx Promises Users it Will Keep Communications Confidential**

49.      Users reasonably expect communications with GoodRx concerning their sensitive health information will remain confidential. GoodRx assured users this information would remain confidential.

50.      GoodRx likewise assured users that it would maintain the privacy and confidentiality of communications made through its platforms. GoodRx's privacy policy reinforces this notion that users' sensitive data, including health information, would not be shared or used by third parties. For instance, between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

51.      Between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

52.      Between October 2017 and December 2019, GoodRx promised that it would only use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx Coupons.

53.      Between October 2017 and October 2019, it promised that when this information was shared in this limited capacity, it "ensures that these third parties are bound to comply with federal standards as to how to treat 'medical data' that is linked with your name, contact information and other personal identifiers."

54.      And in March of 2019, GoodRx promised it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

55.      GoodRx's HeyDoctor privacy policy made similar promises, never disclosing or mentioning that health information would be used or shared with advertisers. Indeed, between

13

October 2018 and July 2020, this policy told users that their information would only be shared to provide access to telehealth services and that GoodRx would obtain users' consent prior to disclosing it for any other reason. It also displayed a HIPPA seal, representing that its website complied with HIPPA regulations, including the prohibition against sharing health information without written authorization from the user.

56.     GoodRx's co-CEO repeated these same sentiments on a publicly available Twitter account. On December 14, 2019, Doug Hirsch—GoodRx's co-CEO—tweeted the following:



57.     He repeated those sentiments in later tweets that same day, reinforcing the notion that users' sensitive data, including health information, was not shared or exploited.



58.     Given these representations and the types of services GoodRx provides, users like Plaintiff and Class members expected their data, including health information, and other interactions on the GoodRx Platform, to remain confidential.

14

59.     Unfortunately, GoodRx's assurances were false. Despite these promises, GoodRx not only disclosed but allowed third parties to intercept highly sensitive personal and medical information that Plaintiff and Class members entered on the GoodRx Platform, including their PII, prescriptions and other health information.

60.     GoodRx knew that it disclosed and allowed third parties to intercept its users' sensitive personal information, including health data. Indeed, it intentionally created "Custom App Events" that were sent to these third parties with obvious names, such as "Drug Name" and "Drug Category" that clearly conveyed health information. It then used this information to categorize users based on the medical condition they had or medication they used to serve targeted advertisements relating to those conditions and treatment.

61.     This information was shared with at least the Advertising and Analytics Defendants Meta, Google, and Criteo, and at least a dozen other companies.

**C.     Meta's Tracking Technology on the GoodRx Platform**

62.     Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, bringing in a grand total of $114.93 billion in 2021. Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."

63.     Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 2.9 billion active users.

64.     Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"

65.    Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements. One of Meta's most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015 and its SDK.

66.    Meta touted Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."

67.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

68.    Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

69.    This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits the GoodRx Platform, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

70.    Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

71.     Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.

72.     Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.

73.     At the time Plaintiff Hollis Wilson used the GoodRx Platform, she maintained active Facebook and Instagram accounts. Plaintiff Hollis Wilson accessed the GoodRx Platform from the same device she used to visit Facebook and Instagram, and Meta associated the data it collected about her from the GoodRx Platform with her Facebook and Instagram accounts and other PII.

74.     Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.

75.     Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app." Custom apps events used by GoodRx often included the medication the user took in the name (i.e., "Drug Name" and "Drug Category").

76.     Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used

to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.

77.     In addition to using the data intercepted through Meta Pixel and the SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

78.     Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

79.     According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?" In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

80.     Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.

81.     GoodRx uses at least the Meta Pixel on the GoodRx Platform. As a result, GoodRx disclosed and Meta intercepted users' interactions on the GoodRx Platform. Meta received at least "Custom Events" named by GoodRx and URLs that disclosed the name of the medication, the health condition relating to that medication, the medication quantity, pharmacy name, and the user's city, state, zip code, and IP address. Meta also received additional PII, including name, email address,

address, phone number, and gender. Meta and GoodRx used this data, as well as other data uploaded directly to Meta by GoodRx, so that GoodRx could run advertisements using its services.

82.     Plaintiff Hollis Wilson provided her PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Meta.

83.     Plaintiff Hollis Wilson did not consent to the interception or disclosure of her data to Meta.  GoodRx's disclosure, and Meta's interception, of Plaintiff Hollis Wilson's PII, health data, and other highly sensitive information without her consent is an invasion of privacy and violates several laws, including the Confidentiality of Medical Information Act ("CMIA") and California Invasion of Privacy Act ("CIPA").

**D.     Google's Tracking Technology on the GoodRx Platform**

84.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

85.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[1]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years.

86.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad

---

[1]  ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

1    revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising

2    network and capabilities by providing more wholesome profiles and data points on individuals.

3        87.    One of these SDKs and tracking pixels is Google Analytics. Google first launched a

4    version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched

5    Google Analytics Synchronous code with new tracking functionality, such as the ability to track

6    commerce transactions. Two years later, Google launched the Google Analytics Asynchronous

7    code, which allowed webpages to load faster and improved data collection and accuracy.

8        88.    Google continued updating its analytics platform, launching Universal Analytics in

9    2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth

10   information about user behavior.  Also, Universal Analytics enabled tracking the same user across

11   multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for

12   a single user with that user's engagement data from one or more sessions initiated from one or more

13   devices."

14       89.    In 2020, Google launched Google Analytics 4, a platform combining Google

15   Analytics with Firebase to analyze both app and web activity. Since launching Google Analytics,

16   Google has become one of the most popular web analytics platforms on the internet. Indeed, Google

17   had a $62.6 billion dollar increase in advertising revenues in 2021, compared to 2020, after

18   launching its most recent version of Google Analytics.

19       90.    Google touts Google Analytics as a marketing platform that offers "a complete

20   understanding of your customers across devices and platforms."[2] It allows companies and

21   advertisers that utilize it to "understand how your customers interact across your sites and apps,

22   throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with

23   Google's machine learning to get more value out of your data," "take action to optimize marketing

24

25   _____
     [2] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10,
26   2023).

27                                            20

28

performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[3]

91.     Google Analytics is incorporated into third-party websites and apps by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects identifiable information, such as the IP address and Client ID.

92.     Once the code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics also allows the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

93.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

94.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

95.     GoodRx uses Google's pixel and SDK on the GoodRx Platform. As a result, GoodRx disclosed and Google intercepted users' interactions on the GoodRx Platform. Google received at least "Custom Events" named by GoodRx and URLs that disclosed the name of the medication,

---

[3] *Id.*

drug type, the health condition relating to that medication, the medication quantity and dosage, and pharmacy ID. Google also received additional PII, including phone number, email address, zip code, IP address, as well as unique advertising IDs and device IDs that uniquely identify the user and their device.

96.    Plaintiff Hollis Wilson provided her PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Google.

97.    Plaintiff Hollis Wilson did not consent to the interception or disclosure of her data to Google.  GoodRx's disclosure, and Google's interception, of Plaintiff Hollis Wilson's PII, health data, and other highly sensitive information without her consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**E.    Criteo's Tracking Technology on the GoodRx Platform**

98.    Criteo is a digital advertising company that focuses on serving personalized advertisements. In 2021, Criteo earned 2.2 billion in revenue.

99.    Criteo offers data collection and advertising technology to other companies. For instance, Criteo offers the "Criteo One Tag" which is a snippet of code similar to the Meta Pixel.

100.    Using the Criteo One Tag, or by uploading data separately, companies like GoodRx can utilize Criteo's advertising platform to target specific users. For instance, Criteo offers "audiences" that group users based on a specific data point or similarity between them.

101.    GoodRx uses Criteo's tracking technology, such as an SDK or pixel, on the GoodRx Platform. As a result, GoodRx disclosed and Criteo intercepted users' interactions on the GoodRx Platform. Criteo received at least users' health information, including what GoodRx Coupons they accessed or used.

102.    Plaintiff Hollis Wilson provided her PII, health information, and other sensitive data to GoodRx to obtain medical treatment and prescriptions. This information was disclosed to and intercepted by Criteo.

103.    Plaintiff Hollis Wilson did not consent to the interception or disclosure of her data to Criteo.  GoodRx's disclosure, and Google's interception, of Plaintiff Hollis Wilson's PII, health data, and other highly sensitive information without her consent is an invasion of privacy and violates several laws, including the CMIA and CIPA.

**F.      Plaintiff and Class Members Do Not Consent to Defendants' Conduct**

104.    Plaintiff and Class Members had no way of knowing that GoodRx was disclosing, and the Advertising and Analytics Defendants were intercepting, their communications when interacting with the GoodRx Platform, because their software is inconspicuously incorporated in the background. Accordingly, Plaintiff and Class Members did not consent to Defendants' conduct in intercepting, sharing, and using their data.

105.    This conduct is all the more egregious given the nature of the information entered into the GoodRx Platform, e.g., PII, requests for prescriptions, and identifiable medical information, among other things. Plaintiff and Class members would not expect this information would be disclosed or intercepted without their consent.

106.    This is especially true given GoodRx's consistent representations that this information would remain private and confidential. For instance, between October 2017 and March 2019, GoodRx's privacy policy stated expressly that "we never provide advertisers or any other third parties any *information that reveals a personal health condition or personal health information*." Accordingly, Plaintiff and Class members did not consent to Defendants' conduct.

**G.      Plaintiff and Class Members Have a Reasonable Expectation of Privacy in Their Communications on the GoodRx Platforms**

107.    Plaintiff and Class members have a reasonable expectation of privacy in their communications on the GoodRx Platform, including their health information.

108.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

109.    For example, a recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

110.    Users act consistent with these preferences.  Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.

111.    Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the government. The same study revealed that 75% of people would abandon brands that do not take care of their data.

112.    Other privacy law experts have expressed concerns about the disclosure to third parties of a users' intimate health data.  For example, Dena Mendelsohn—the former Senior Policy Counsel at Consumer Reports and current Director of Health Policy and Data Governance at Elektra Labs—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you're charged on loans, and leave you vulnerable to workplace discrimination.

113.    Defendants' surreptitious disclosure and interception of Plaintiff and Class members' privacy communications, including PII, health information, and other sensitive data violates Plaintiff's and Class members' privacy interests.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**H.     Defendants Improperly Used GoodRx Users' Data**

114.    The data GoodRx disclosed—and the Advertising and Analytics Defendants intercepted—is also extremely valuable. According to Experian, health data is a "gold mine" for healthcare companies and clinicians.

115.    Consumers' health data, including what prescriptions they have, are extremely profitable. For instance, Datarade.ai advertises access to U.S. customers names, addresses, email addresses, telephone numbers who bought brand name medicine. The starting price for access to just some of this data was $10,000. Other companies, like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.

116.    Defendant GoodRx monetized and used the data collected from GoodRx users to serve personalized advertisements. For example, GoodRx used (and paid) Meta to serve advertisements based on users' prescription medication.

117.    Specifically, using Meta's "Ads Manager" and "Custom Audiences" feature, GoodRx identified users with Facebook and Instagram accounts, and also uploaded data directly to Meta, including users' email addresses, phone numbers, and mobile identifiers (e.g., device IDs and advertising IDs) to identify users.

118.    GoodRx then categorized users based on their health information (e.g., users who had used a certain prescription) it disclosed and allowed Meta to intercept and used this information to create Custom Audiences. It named these Custom Audiences based on the medication these users had been prescribed (e.g., "atorvastatin claims" to mark atorvastatin prescription users). It then used these Custom Audiences to serve personalized ads, including those related to their medical treatment and prescription information.

119.    GoodRx ran these targeted advertising campaigns on Instagram and Facebook between 2017 and 2020.

120.    For instance, between August 2017 and March 2018, GoodRx served targeted advertisements based on users who viewed drug pages for Losartan, Amlodipine, Zolpidem, Topiramate, and Quetiapine, respectively.

121.    Between November 1, 2018 and February 29, 2019, GoodRx targeted users who visited HeyDoctor's webpages for sexually transmitted diseases.

122.    Between July 22 and August 4, 2019, GoodRx targeted users who viewed GoodRx Coupons for Lipitor, Lisinopril, Neurontin, Prednisone, and Zithromax. The ads featured those prescriptions.

123.    In August 2019 GoodRx ran a campaign using Meta's services based on users who had purchased prescriptions for Lisinopril, Azithromycin, Atorvastatin, or Prednisone. Each of these users were grouped into a Custom Audience based on which of these prescriptions they used, titled "lisinopril claims" "atorvastatin claims" "azith claims" and "pred claims."

124.    Between November 1 and December 6, 2019, GoodRx targeted users who visited HeyDoctor's webpages for erectile dysfunction with advertisements promoting prescriptions for this condition.

125.    Between January 9, 2020 and February 25, 2020, GoodRx targeted users who had viewed GoodRx Coupons for Cialis or Sildenafil.

126.    In January 2020, GoodRx targeted users who viewed GoodRx Coupons for birth control, and in February 2020 it targeted users who accessed GoodRx Coupons for Cialis or Sildenafil with advertisements for Viagra.

127.    The above list, while not exhaustive, details the extreme abuses by GoodRx and Advertising and Analytics Defendants of Plaintiff's sensitive data.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

128.    Defendants had exclusive knowledge that the GoodRx Platform incorporated the Advertising and Analytics Defendants' software, yet failed to disclose that fact to users, or that by

interacting with the GoodRx Platform Plaintiff and Class members' sensitive data, including PII and health data, would be disclosed to and intercepted by third parties

129.    Defendant GoodRx secretly incorporated the Advertising and Analytics Defendants' software into the GoodRx Platform, providing no indication to users that they were interacting with sites that shared their data, including PII and health data, with third parties.

130.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

131.    Plaintiff and Class members could not with due diligence have discovered the full scope of Defendants' conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that GoodRx was disclosing and third parties were intercepting data from the GoodRx Platform.

132.    The earliest Plaintiff and Class members could have known about Defendants' conduct was shortly before the filing of this Complaint.

133.    Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so.  Defendants are therefore estopped from relying on any statute of limitations under the discovery rule.

134.    Additionally, Defendants engaged in fraudulent conduct to prevent Plaintiff and Class members from discovering the disclosure and interception of their data. GoodRx misled Plaintiff and Class members to believe their data, including health data and PII, would not be disclosed or intercepted.

135.    GoodRx represented to Plaintiff and Class members that it complied with HIPPA. It also promised Plaintiff and Class members that their data would not be disclosed or used for advertising.

136.    Plaintiff and Class members were not aware that Defendants disclosed and intercepted their data, including PII and health information.

137.    Plaintiff and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendants' misconduct by virtue of their fraudulent concealment.

138.    Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> **Nationwide Class:** All natural persons in the United States who used the GoodRx Platform and whose communications and/or data were shared with third parties, including the Advertising and Analytics Defendants.

140.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

141.    **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable.  The Class likely consists of millions of individuals, and the members can be identified through GoodRx's records.

142.    **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

- Whether Defendants violated Plaintiff's and Class members' privacy rights;

- Whether Defendants' acts and practices violated the Common Law Invasion of Privacy;

- Whether Defendants were unjustly enriched;

28

- Whether Defendants' acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;
- Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;
- Whether Plaintiff and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and
- Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

143.   **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class.  The claims of Plaintiff and the members of the Class arise from the same conduct by Defendants and are based on the same legal theories.

144.   **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations.  Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendants have no defenses unique to any Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

145.   **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

146.    Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

147.    California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Classes under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV. § 1 of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and Class members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

148.    GoodRx, Meta, and Google maintain their principal places of business in California and conduct substantial business in California, such that California has an interest in regulating GoodRx, Meta, and Google's conduct under its laws. Google and Meta also each selected California law as the law to govern all disputes with their customers in their respective terms of service. Defendants GoodRx, Meta, and Google's decision to reside in California and avail themselves of California's laws, renders the application of California law to the claims herein constitutionally permissible.

149.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Classes, and California has a greater interest in applying its laws here given Defendants' locations and the location of the conduct at issue than any other interested state.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of the Plaintiff and the Class)**
**(Against all Defendants)**

150.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

30

151.   A Plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

152.   GoodRx's disclosure of Plaintiff's and Class members' sensitive data, including PII, health information, prescription requests and other interactions on the GoodRx Platform, to third parties like the Advertising and Analytics Defendants constitutes an intentional intrusion upon Plaintiff's and Class members' solitude or seclusion.

153.   Plaintiff and Class members had a reasonable expectation of privacy in the health information and other personal data that GoodRx disclosed to third parties. Plaintiff's health information, prescription requests, and other interactions with the GoodRx Platform are inherently sensitive in nature. Plaintiff and Class members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

154.   This expectation is especially heightened given GoodRx's consistent representations to users that this information would be safeguarded and not disclosed to third parties like Meta, Google, and Criteo.

155.   GoodRx promised that it would only use personal medical data such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx Coupons.

156.   Indeed, in March of 2019, GoodRx promised it adheres to the Digital Advertising Alliance principles. These principles state that entities "should not collect and use . . . pharmaceutical prescriptions, or medical records about a specific individual for Online Behavioral Advertising without Consent."

157.   And its co-CEO publicly made similar statements, tweeting "People can use GoodRx without giving us any information. Any information we do receive is stored under the *same guidelines as any health entity*."

158.    Given these representations, and the nature of the data GoodRx received, Plaintiff and Class members had a reasonable expectation of privacy in their data relating to their use of the GoodRx Platform and expected this information would not be disclosed.

159.    Plaintiff and Class members did not consent to, authorize, or know about GoodRx's intrusion at the time it occurred. Accordingly, Plaintiff and Class members never agreed that GoodRx could disclose their data to third parties.

160.    The surreptitious disclosure of sensitive data, including PII and health information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

161.    The offensiveness of this conduct is all the more apparent because GoodRx's disclosure of this information was conducted in secret in a manner that Plaintiff and Class members would be unable to detect through the incorporation of highly technical SDKs and pixels that was contrary to the actual representations made by GoodRx.

162.    As a result of GoodRx's actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

163.    Plaintiff and Class members have been damaged as a direct and proximate result of GoodRx's invasion of their privacy and are entitled to just compensation, including monetary damages.

164.    Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by GoodRx as a result of its intrusions upon Plaintiff's and Class members' privacy.

165.    Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of GoodRx's actions, directed at injuring Plaintiff and

Class members in conscious disregard of their rights.  Such damages are needed to deter Defendants from engaging in such conduct in the future.

166.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**SECOND CLAIM FOR RELIEF**
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of the Plaintiff and the Class)**
**(Against Advertising and Analytics Defendants)**

167.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

168.    A Plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff have a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

169.    Advertising and Analytics Defendants' surreptitious interception, storage, and use of Plaintiff and Class members' interactions and communications with the GoodRx Platform, including PII, health information, and prescription requests, constitutes an intentional intrusion upon Plaintiff and Class members' solitude or seclusion.

170.    Plaintiff and Class members expected this information to remain private and confidential given the nature of the GoodRx Platform, which is primarily used to receive medical advice, treatment, prescriptions, and prescription coupons.

171.    This expectation is especially heightened given GoodRx's consistent representations that this data would remain confidential. Plaintiff and Class members did not expect third parties, and specifically Advertising and Analytics Defendants, to secretly intercept this information and their communications.

172.    Plaintiff and Class members did not consent to, authorize, or know about Advertising and Analytics Defendants' intrusion at the time it occurred. Plaintiff and Class members never agreed that Advertising and Analytics Defendants could intercept, store, and use this data.

33

173.    Defendants' intentional intrusion on Plaintiff's and Class members' solitude or seclusion would be highly offensive to a reasonable person. Plaintiff and Class members reasonably expected, based on GoodRx's repeated assurances, that their information would not be disclosed to or collected by any third parties, including to Advertising and Analytics Defendants.

174.    The surreptitious taking and interception of sensitive data, including PII and medical information from millions of individuals was highly offensive because it violated expectations of privacy that have been established by social norms.  Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

175.    The offensiveness of this conduct is all the more apparent because Advertising and Analytics Defendants' interception, storage, and use of this information was conducted inconspicuously in a manner that Plaintiff and Class members would be unable to detect and was contrary to the actual representations made by GoodRx.

176.    Given the highly sensitive of the data that Advertising and Analytics Defendants intercepted, such as private details about medications and health information, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

177.    As a result of Advertising and Analytics Defendants' actions, Plaintiff and Class members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

178.    Plaintiff and Class members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

179.    Plaintiff and Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of its intrusions upon Plaintiff's and Class members' privacy.

180.     Plaintiff and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class members in conscious disregard of their rights.  Such damages are needed to deter Defendants from engaging in such conduct in the future.

181.     Plaintiff also seeks such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**
**(Against All Defendants)**

182.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

183.     Defendants received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense.

184.     Defendants received benefits from Plaintiff and Class members in the form of the Plaintiff's highly valuable data, including health information and PII, that Defendants wrongfully disclosed and intercepted from Plaintiff and Class members without authorization and proper compensation.

185.     Defendants disclosed, intercepted, stored, and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

186.     Had Plaintiff known of Defendants' misconduct, she would not have provided any of their data to Defendants or have used or paid to use the GoodRx Platform.

187.     Defendants unjustly retained these benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

188.     The benefits that GoodRx derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in

35

California and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

189.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Violation of California Confidentiality of Medical Information Act ("CMIA")**
**Civil Code Section 56.06**
**(On Behalf of Plaintiff and the Class)**
**(Against GoodRx)**

190.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

191.    GoodRx is a provider of healthcare under Cal. Civ. Code Section 56.06, subdivisions (a) and (b), because the GoodRx Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a heath care provider, or for the diagnoses, treatment, or management of a medical condition.

192.    GoodRx is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

193.    The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information GoodRx maintained and disclosed is medical information because it is identifiable information relating to patient's medical histories, conditions, treatments, and prescriptions.

194.   GoodRx violated Cal. Civ. Code Section 56.06(e) because it did not maintain the confidentiality of users' medical information. GoodRx disclosed to third parties Plaintiff's and Class members' medical information without consent, including information concerning medications they were taking or were prescribed.

195.   GoodRx shared this identifiable information with third parties, including Meta, Google, and Criteo and whose primary business includes selling advertisements, analytics, or other insights based on the data they obtain about individuals, and using such data to improve their products, services, and algorithms.

196.   GoodRx knowingly and willfully disclosed medical information without consent to Advertising and Analytics Defendants for financial gain.  Namely, to sell more products, advertise, obtain analytics, and improve the GoodRx Platform, in violation of Cal. Civ. Code Section 56.06(e). GoodRx's conduct was knowing and willful as they were aware that Advertising and Analytics Defendants would obtain all user data input while using their sites, yet intentionally embedded Advertising and Analytics Defendants' code anyway.

197.   At the very least, GoodRx negligently disclosed medical information to Advertising and Analytics Defendants in violation of Cal. Civ. Code Section 56.06(e).

198.   Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**FIFTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Civil Code Section 56.101**
**(On Behalf of Plaintiff and the Class)**
**(Against GoodRx)**

199.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

200.    Cal. Civ. Code Section 56.101 (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

201.    Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36[.]"

202.    GoodRx is a provider of health care who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information.

203.    GoodRx failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Advertising and Analytics Defendants, Plaintiff's and Class members' medical information, including information concerning medications they were taking or were prescribed.

204.    GoodRx's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates Cal. Civ. Code Section 56.101 (a).

205.    Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.36(c); and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SIXTH CLAIM FOR RELIEF**
**Violation of CMIA**
**Civil Code Section 56.10**
**(On Behalf of Plaintiff and the Class)**
**(Against GoodRx)**

206.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

207. Cal. Civ. Code Section 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

208. GoodRx disclosed medical information without first obtaining authorization when it disclosed to third parties Advertising and Analytics Defendants Plaintiff's and Class members' data, including PII and prescription requests. No statutory exception applies.

209. GoodRx knowingly and willfully disclosed medical information without consent to Advertising and Analytics Defendants for financial gain. Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code Section 56.10, subdivision (a).

210. At the very least, GoodRx negligently disclosed medical information in violation of Cal. Civ. Code Section 56.10, subdivision (a) through the unauthorized disclosure of Plaintiff's and Class members' sensitive medical information.

211. Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000 per violation; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Cal. Civ. Code Section 56.35; and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violation of CMIA**
**Civil Code Section 56.06, 56.101, 56.10**
**(On Behalf of Plaintiff and the Class)**
**(Against Advertising and Analytics Defendants)**

212. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

213. As set forth herein, GoodRx's disclosure of Plaintiff's and Class members medical information violates the CMIA.

214. By contracting with GoodRx to receive and use Plaintiff's and Class members' data and communications, including medical information, as well as providing the means to accomplish

39

this objective, Advertising and Analytics Defendants acted intentionally or alternatively, with knowledge that GoodRx's misappropriation of Plaintiff's and Class members' medical information was a violation of the CMIA.

215.    Advertising and Analytics Defendants provided substantial assistance and encouragement to GoodRx's violation of the CMIA, including by providing the means, i.e., SDKs and pixels, to share and disclose this data. Advertising and Analytics Defendants knew that their software could be seamlessly integrated without alerting users that their sensitive medical information would be shared with Advertising and Analytics Defendants.

216.    Advertising and Analytics Defendants' agreements with GoodRx and receipt of Plaintiff's and Class members' sensitive information, including medical information, is a substantial factor in causing the violations of the CMIA alleged herein. For example, in the absence of Advertising and Analytics Defendants' technology, GoodRx would likely not have shared Plaintiff's and Class members' medical information.

217.    Given the lucrative value of Plaintiff's and Class members' medical information, Advertising and Analytics Defendants were willing to receive, and encouraged, GoodRx to share this data. As a result, Advertising and Analytics Defendants aided and abetted GoodRx's CMIA violations and are therefore jointly liable with GoodRx for the relief sought by Plaintiff and the Class.

## EIGTH CLAIM FOR RELIEF
### Violation of CMIA
### Civil Code Section 56.36
### (On Behalf of Plaintiff and the Class)
### (Against Advertising and Analytics Defendants)

218.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

219.    Cal. Civ. Code Section 56.36(B)(3)(A) prohibits any person of entity other than a licensed health care professional from knowingly or willfully obtaining medical information for financial gain.

220.    Cal. Civ. Code Section 56.36(B)(5) prohibits any person or entity who is not permitted to receive medical information under the CMIA from knowingly and willfully obtaining, disclosing, or using the medical information without written authorization.

221.    The Advertising and Analytics Defendants are entities who are not licensed health care professionals, and Advertising and Analytics Defendants are not permitted to receive medical information under the CMIA.

222.    The Advertising and Analytics Defendants violated Cal. Civ. Code Sections 56.36(B)(3)(A) and (B)(5) because they knowingly and willfully obtained medical information from the GoodRx Platform without authorization for their own financial gain.

223.    As described herein, the Advertising and Analytics Defendants intentionally designed their software to intercept data from the websites and mobile applications in which they are incorporated.

224.    The Advertising and Analytics Defendants knew this software was incorporated on websites and mobile applications that would consequently lead to the interception of medical information, including medical information input in the GoodRx Platform.

225.    The Advertising and Analytics Defendants knowingly and willfully received this information without written authorization from Plaintiff and Class members, and did so for their own financial gain. Namely, to profit through advertising and analytics services they offer, as well as to improve their algorithms, data points, and other technologies.

226.    Pursuant to Cal. Civ. Code Section 56.36(B)(3)(A) and Cal. Civ. Code Section 56.36(B)(5), the Advertising and Analytics Defendants are liable for a civil penalty up to $250,000 per violation of these sections.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**NINTH CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the Class and Subclass)**
**(Against All Defendants)**

227.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

228.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.  Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

229.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

230.    Defendants are persons for purposes of § 631.

231.    Defendants GoodRx, Meta, and Google maintain their principal places of business in California, where they designed, contrived, agreed, conspired, effectuated, and/or received the

interception and use of the contents of Plaintiff and Class members' communications. Additionally, Google and Meta have adopted California substantive law to govern their relationship with users.

232.   The Advertising and Analytics Defendants' technology (i.e., SDKs and pixels), Plaintiff's and Class members' browsers and mobile applications, and Plaintiff's and Class members' computing and mobile devices are a "machine, instrument, contrivance, or . . . other manner."

233.   At all relevant times, the Advertising and Analytics Defendants, through their SDKs and pixels, intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiff and Class members and GoodRx's website and app without the consent of all parties to the communication.

234.   The Advertising and Analytics Defendants, willfully and without the consent of Plaintiff and Class members, read or attempt to read, or learn the contents or meaning of Plaintiff and Class members' communications to GoodRx while the communications are in transit or passing over any wire, line or cable, or were being received at any place within California when it intercepted Plaintiff and Class members' communications and data with GoodRx, which is headquartered in California, in real time.

235.   The Advertising and Analytics Defendants used or attempted to use the communications and information they received through their tracking technology, including to supply analytics and advertising services.

236.   By incorporating the Advertising and Analytics Defendants' technology on its website, GoodRx aided, agreed with, employed, and conspired with Advertising and Analytics Defendants to carry out the wrongful conduct alleged herein.

237.   The interception of Plaintiff's and Class members' communications was without authorization and consent from the Plaintiff and Class members. Accordingly, the interception was unlawful and tortious.

238.   Plaintiff and the Class members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

239.   Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class members' sensitive data has been disclosed, viewed, stored, and used by Advertising and Analytics Defendants, have not been destroyed, and due to the continuing threat of such injury, Plaintiff and Class members have no adequate remedy at law and are entitled to injunctive relief.

**TENTH CLAIM FOR RELIEF**
**Violation of CIPA**
**Cal. Penal Code § 632**
**(On Behalf of Plaintiff and the Class and Subclass)**
**(Against Advertising and Analytics Defendants)**

240.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

241.   Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication". .

242.   Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

243.   Plaintiff and Class members' communications to GoodRx, including their sensitive medical information including information concerning medications they were taking or were prescribed, their medical histories, allergies, and answers to other health-related questions, were confidential communications for purposes of § 632, because Plaintiff and Class members had an objectively reasonable expectation of privacy in this data.

244.   Plaintiff and Class members expected their communications to GoodRx to be confined to GoodRx in part, because of GoodRx's consistent representations that these communications would remain confidential. Plaintiff and Class members did not expect third parties, and specifically Advertising and Analytics Defendants, to secretly eavesdrop upon or record this information and their communications.

245.   The Advertising and Analytics Defendants' tracking technology, i.e., SDKs and pixels, are all electronic amplifying or recording devices for purposes of § 632.

246.   By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to GoodRx through this technology, Advertising and Analytics Defendants eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

247.   At no time did Plaintiff or Class members consent to the Advertising and Analytics Defendants' conduct, nor could they reasonably expect that their communications to GoodRx would be overheard or recorded by Advertising and Analytics Defendants.

248.   The Advertising and Analytics Defendants utilized Plaintiff's and Class members' sensitive medical information for their own purposes, including advertising and analytics.

249.   Plaintiff and Class members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

250.   Plaintiff and Class members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class members' sensitive data has been collected, viewed, accessed, stored, by Advertising and Analytics Defendants, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law, Plaintiff and Class members are entitled to injunctive relief.

### ELEVENTH CLAIM FOR RELIEF
#### Violation of the California Consumers Legal Remedies Act ("CLRA")
#### Cal. Civ. Code §§ 1750, *et seq*
#### (On Behalf of Plaintiff and the Class)
#### (Against GoodRx)

251.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

252.   GoodRx engaged in "unfair methods of competition and unfair or deceptive acts . . . in a transaction . . . that result[ed] . . . in the sale . . . of goods" to Plaintiff and the Class members in violation of Cal. Civ. Code § 1750 and Cal. Civ. Code § 1770(a)(5), (7), (9), (14), (16).

253.   For instance, GoodRx made representations that it would protect Plaintiff's privacy interest, including promising that it would "never provide advertisers or any other third parties any *information that reveals a personal health condition or personal health information*."

254.   GoodRx promised that it would only use "personal medical data" such as prescription drug information in "limited cases" as necessary to fulfill the user's request. For instance, to text or email GoodRx coupons.

255.   It also represented in public tweets and by displaying the HIPPA seal that it complied with HIPPA, which prohibits the disclosure of data for advertising and analytics without written authorization from the user.

256.   GoodRx made these representations with no intention of living up to these representations. Contrary to these representations, GoodRx disclosed and allowed third parties to intercept Good Rx users' sensitive data, including health data and PII.

257.   Further, GoodRx failed to disclose it secretly shared, used, and allowed third parties to intercept Plaintiff's and Class members' sensitive data, including PII and health information.

258.   GoodRx was under a duty to disclose this information given its relationship with GoodRx users and its exclusive knowledge of its misconduct (e.g., the technology incorporated on the GoodRx platform, the data is disclosed and allowed third parties to intercept through this technology, and how it and third parties used this data).

259.    Plaintiff and Class members would not have purchased, or would have paid significantly less for, GoodRx services and products had GoodRx not made these false representations. GoodRx profited directly from these sales, including through payment for these services and products, and from the data disclosed and intercepted.

260.    Plaintiff, individually and on behalf of the Class, seeks an injunction requiring GoodRx to obtain consent prior to disclosing and otherwise using Plaintiff's and Class members' sensitive personal data and to delete the data already collected, and any other relief which the court deems proper.

261.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiff served GoodRx with notice of its alleged violations of the CLRA contemporaneously with the filing of this complaint. Should GoodRx fail to provide appropriate relief for its violations of the CLRA within 30 days, Plaintiff intends to seek monetary damages under the CLRA.

262.    In accordance with Cal. Civ. Code § 1780(d), Plaintiff's CLRA venue declaration is attached hereto as Exhibit A.

## TWELFTH CLAIM FOR RELIEF
### Violations of Cal. Bus. & Prof. Code §§ 17200 *et. seq.*
### (On Behalf of Plaintiff and the Class)
### (Against All Defendants)

263.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

264.    Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq*. ("UCL"), because, as alleged above, Defendants violated the California common law and other statutes and causes of action described herein.

265.    Defendants' business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendants violated this public policy by, among other things, disclosing and

47

intercepting Plaintiff's and Class members' sensitive data, including PII and health data, without consent.

266.     GoodRx further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties, which deceived and misled users of the GoodRx platform.

267.     Defendants' business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendants secretly disclosing, intercepting, and misusing Plaintiff's and Class members' sensitive personal data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Class members were completely unaware of Defendants' conduct, they could not have possibly avoided the harm.

268.     Defendants' business acts and practices are also "fraudulent" within the meaning of the UCL. Defendant GoodRx disclosed, and the Advertising and Analytics Defendants intercepted, a large collection of sensitive personal data, including health information and PII, without disclosing this practice and therefore acted without users' knowledge or consent. Defendants' business acts and practices were likely to, and did, deceive members of the public including Plaintiff and Class members into believing this data was private and would not be shared with third parties.

269.     GoodRx assured users that it "never provide[s] advertisers or any other third parties any ***information that reveals a personal health condition or personal health information***."

270.     GoodRx did not disclose that it would share this data with third parties, including with Advertising and Analytics Defendants.

271.     Such information was not kept private, as GoodRx disclosed and allowed the Advertising and Analytics Defendants to intercept this data.

272.     Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

273.   Had Plaintiff and Class members known their personal information, including health data and PII, would be disclosed and intercepted, they would not have used or purchased, or would have paid significantly less for, GoodRx services and products.

274.   Plaintiff and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and intercepting Plaintiff's and Class members' information, Defendants have taken property from Plaintiff and Class members without providing just or any compensation.

275.   Health data, including prescription information, objectively has value. Companies are willing to pay for this data, including the disclosed to and intercepted by Advertising and Analytics Defendants. For instance, Pfizer annually pays approximately $12 million to purchase health data from various sources.

276.   This data also objectively has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[4]

277.   By unlawfully disclosing and intercepting this data, Defendants have taken money or property from Plaintiff and Class members.

278.   For these reasons, Plaintiff seeks at least restitution and other equitable relief on behalf of herself and Class members as a result of Defendants' violations of the UCL. Plaintiff seeks these remedies in the alternative to any adequate remedy at law she may have.

### PRAYER FOR RELIEF

---

[4] Andrea Park, *How much should health data cost? $100K or more, according to patients*, BECKER'S HOSP. REV. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

WHEREFORE, Plaintiff on behalf of themselves and the proposed Class respectfully requests that the Court enter an order:

A.    Certifying the Class and appointing Plaintiff as the Class's representative;

B.    Finding that Defendants' conduct was unlawful, as alleged herein;

C.    Awarding declaratory relief against Defendants;

D.    Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.    Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.    Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G.    Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H.    Granting such other relief as the Court deems just and proper.

Dated: March 20, 2023                     _____/s/ Jonathan Shub_____

Jonathan Shub # 237708
Benjamin F. Johns (*pro hac vice* forthcoming)
Samantha E. Holbrook (*pro hac vice* forthcoming)
**SHUB LAW FIRM LLC**
134 Kings Highway E
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Counsel for Plaintiff*

50